# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 04 C 4325 |
| 5.0 ACRES OF LAND, More or Less, | ) | |
| Situated in Grundy County, State of Illinois, | ) | Judge Joan B. Gottschall |
| STANDARD BANK & TRUST COMPANY, | ) | |
| as Trustee, under the Provisions of a Trust | ) | |
| Agreement Dated the 28th Day of January | ) | |
| 1992, Known as Trust Number 13162, and | ) | |
| Unknown Owners, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons set forth below, the court finds that the Government's taking of the accused 5.0 Acres of Land is neither arbitrary nor capricious and is within the Government's enforceable power of eminent domain under the Constitution. The Government is ordered to pay the sum of $199,375 in compensation and severance damages.

### I. BACKGROUND

In 1992, George Eck, Sr. ("Eck Sr.") purchased a 195-acre plot of land on the northern bank of the Illinois River in Grundy County, Illinois for use as a recreational, conservation, and hunting preserve for his family. Most of the northern portion of the property is wooded, with the exception of an easement extending from east to west across the property for towers supporting high tension electrical wires. Approximately 60 acres of the land is farmed by a tenant farmer. A railroad embankment belonging to the Elgin,

Joliet & Eastern Railroad extends north and south along the eastern boundary of the property. And an approximately 25-acre site in the southwestern corner of the property was developed as a wetlands site for migratory waterfowl, which the Ecks developed for conservation and used for hunting during the annual duck and goose seasons.

The wetlands site consists of a series of ponds at various elevations which can be flooded or drained as needed. Water from a storm sewer can be pumped into the pond situated at the highest elevation, which can then be drained to fill the lower ponds. An aeration system in the ponds can be turned on to prevent the ponds from freezing over during the colder months of the hunting season. In a typical year, the ponds are flooded in the early fall, just prior to the hunting season, which corresponds to the annual southerly migration of waterfowl.[1] The ponds are drained in January, after conclusion of the hunting season, and crops are planted on the site in the spring or summer to support the transient waterfowl population on its southerly winter migration.

Also incorporated into the wetlands site are a series of duck blinds, some of them permanent structures based on concrete foundations and some of them moveable blinds. The Eck family, which owns a construction business, designed and built the site themselves with the aid of friends. George Eck, Jr. ("Eck Jr.") invested considerable time in designing the site, traveling to visit other wetlands conservation/hunting sites as far afield as the Delta Waterfowl Research Center in Manitoba, Canada. The result is a site that experts at the trial praised as a model for a privately-owned and developed wetlands site for conservation and hunting purposes.

---

[1] In Illinois, duck hunting season is typically of 60 days' duration, extending from late October through late December. The season for Canada geese lasts 85 days from late October through the end of January, and typically includes a two-week mid-season respite in November. The Ecks hunt other wildlife on their property, but the evidence that such hunting would be affected by the taking at issue in this case was inconclusive.

The Ecks' property is also in the vicinity of the Dresden Island Lock and Dam at mile 272 on the Illinois River. Silting of the river in this vicinity requires periodic dredging in order to keep the river navigable along its length to support commercial traffic traveling between Lake Michigan and the Mississippi. Dredging of the River is performed by the U.S. Army Corps of Engineers (the "Corps of Engineers") in accordance with the relevant portion of its 2000 Dredged Material Management Plan (the "DMMP") for Dredged Material Placement.[2]

An enduring problem of dredging operations is where to place the dredged material once it has been excavated from the river bed. The DMMP identified and selected six sites as feasible for deposition of dredged materials, identified as Sites 1, 2, 5, 6, 10, and 15. Site 15 comprises a 5-acre strip in the southeastern corner of the Ecks' property (the defendant "5.0 Acres") approximately 260 feet wide and 755 feet deep, paralleling and abutting the railway embankment and oriented with its long axis perpendicular to the river bank and parallel to the embankment. The DMMP noted that dredged material could be moved from barges directly onto the property and moved inland by bulldozers; partial berms would be constructed to contain the dredged materials on the site. Consequently, the Attorney General of the United States, at the request of and in the name of the Corps of Engineers (the "Government"), filed suit to take the 5.0 Acres under the power of eminent domain and to ascertain and award just compensation to the Ecks.

After the publication of the DMPP and prior to the time the Corps of Engineers began these condemnation proceedings, the parties engaged in extensive negotiations.

[2] Site Plan for the Dresden Island Upper/Lower Dredge Cuts Dresden and Marseilles Pools. U.S. Army Corps of Engineers, Rock Island District, February, 2000.

George Sporer ("Sporer"), the realty specialist employed by the Corps of Engineers who led the negotiations on behalf of the Government until he was deployed to Afghanistan in 2002, testified that when he first looked at the property, in 1997 or 1998, it was all planted in corn, but based on conversations with the Ecks in 2002, he learned that they had acquired the land in order to hunt.[3]  When Sporer met with the Ecks in Maquoketa in April 2002, he agreed that the Corps of Engineers would try to accommodate some of the Ecks' requests such as possibly erecting fencing (expert testimony at trial established that waterfowl are particularly sensitive to what they can see and require visual isolation from disturbance.  Tr. 201.  Moreover, while the Corps of Engineers could not agree to a no-dredging period, they could agree to dredge in hunting season only when necessary.  Indeed, Sporer testified, Illinois law requires precisely that.  Sporer Dep. 74.  He testified:

> Q:     Now, when they say that you couldn't agree to when the dredging was, does that refer to Paragraph 2 where they requested a no-dredging period?
>
> A:     I didn't say that.  I didn't say that we couldn't agree on that.  He wanted to do it for ducks and water fowl and what have you.  Again, we're required by state law to attempt to do that, but if the Illinois waterway is shut down because it's too shallow the Corps is going to go in there and dredge it out.
>
> Q:     So it could have been done–an agreement could be reached where you would dredge under circumstances like that?
>
> A:     Well, we normally do, sure.
>
> Q:     Right.
>
> A:     We try to accommodate it, but you can't say thou shall never, ever do this during duck and fowl season.  If you can accommodate it, fine.
>
> Q:     Was an alternative proposal for this ever given to the Ecks?

---

[3] Sporer testified that this was the Government's first notice that the Ecks intended so to use the property. Sporer Dep. 28.

A:    Yes.  I talked to them about it and they asked me the same question you just asked me.  Can we work around the duck and fowl season?  And I said, well, of course, we can, but we have no guarantees that we can do that.  For a practical matter most of this work–most of their hunting season is in the winter and we don't dredge in the winter, so it's kind of a moot point, but there's no reason that we couldn't have worked (sic) about it, but for them to dictate to us when we could use our own land, unacceptable.

Q: … Could you have come up with an agreement even if you had purchased the land in fee simple that you would try to avoid the duck hunting season - -

A:    Sure.

*Id.* 93-94.

In this case, unfortunately, no such agreement could be reached between the parties.  The Ecks continued to object strenuously to the taking, claiming that the taking was invalid because the Government had acted arbitrarily and capriciously in selecting the site and in its dealings with the Ecks.  Moreover, the Ecks claim that the Government's proposed compensation of $80,000 for the property grossly undervalues the 5.0 Acres and the severance damages to the remainder of their property.  After a four-day bench trial, both parties submitted their proposed findings of fact and conclusions of law, followed by closing arguments.

## II. Analysis

Throughout the course of these proceedings, it has been clear that the impact of the Corps of Engineers' activity on the ability of the Ecks to hunt and properly manage the wildlife that utilizes their property depends on when the Corps of Engineers dredges and dumps.  The Government's Fish and Wildlife Service representative, Robert A. Clevenstine ("Clevenstine"), testified at trial that, assuming that the presence of equipment and personnel on site during the hunting season was a rare or infrequent event,

there would be only a temporary disturbance of wildlife; "dredging during the hunting season in the central zone is so infrequent … [that] … the likelihood of there being equipment and personnel on site during the hunt was very slim."  Tr. 564, 569.  Charles S. Potter, Jr. ("Potter"), president and chief executive officer of the Max McGraw Wildlife Foundation, called by the Ecks, did not significantly disagree.  He testified that "this site [the 5.0 Acres selected by the Corps of Engineers] would have minimal impact on [Eck's] management of his property if the dredging was done from February to September, and that it would have significant impact from September to February."  Tr. 279.

A. The Validity of the Taking

In its complaint, the Government cites as authority for the taking 40 U.S.C. § 3114, *et seq.*, 33 U.S.C. § 591, *et seq.*, and 33 U.S.C. § 594, *et seq*., which authorize the acquisition of land for river and harbor purposes; the Act of Congress (Public Law 560, 69th Congress) authorizing operation and maintenance of the nine-foot channel for the Illinois River and for the disposal of dredged material; and the Energy and Water Development Appropriations Act of 2000 (Public Law 106-377), which appropriated funds for those purposes.  The Ecks do not dispute that the taking of the 5.0 Acres for the purpose of depositing dredged material is for a valid public purpose.  Rather, they argue that the Government acted arbitrarily and capriciously in its selection of the site and in its dealings with the Ecks prior to the taking.  Specifically, the Ecks contend that the Government acted arbitrarily and capriciously by: (1) violating its own regulations in evaluating and selecting the 5.0 Acres; (2) failing to describe or evaluate alternative sites; and (3) violating its regulations by failing to update the DMMP report.

The grounds upon which courts can exert judicial review with respect to the Government's right of eminent domain are fundamental but narrow. The Supreme Court delineated the limits of that judicial review function in *Shoemaker v. United States*:

> [W]hile the courts have power to determine whether the use for which private property is authorized by the legislature to be taken is in fact a public use, yet, if this question is decided in the affirmative, the judicial function is exhausted; that the extent to which such property shall be taken for such use rests wholly in the legislative discretion, subject only to the restraint that just compensation must be made.

147 U.S. 282, 298 (1893). This articulation was reaffirmed in *Berman v. Parker*, 348 U.S. 26, 35 (1954) ("Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch."). It is not entirely clear, however, what scrutiny beyond the simple determination that the land is being taken for a public purpose is appropriate. The Supreme Court has not resolved the extent, if any, to which judicial review extends to the basis for the agency's decision, although it is clear that to some extent, the determination of whether the taking of private property is for a public use may be appropriately and materially aided by determining the good faith and rationality of the Governmental body in exercising its power of eminent domain. *United States v. Carmack*, 329 U.S. 230, 243 (1946) ("In this case, it is unnecessary to determine whether or not this selection could have been set aside by the courts as unauthorized by Congress if the designated officials had acted in bad faith or so "capriciously and arbitrarily" that their action was without adequate determining principle or was unreasoned."); *see also United States v. Meyer,* 113 F.2d 387, 392 (7th Cir. 1940).

Hence, the Supreme Court has not ruled out the possibility of judicial review where the administrative decision to condemn a particular property or property interest is alleged to be arbitrary, capricious, or in bad faith. *Carmack*, 329 U.S. at 243-244. Seventh Circuit caselaw recognizes that an exception exists to the general powerlessness of courts to review eminent domain takings in circumstances of bad faith or abuse of discretion. *Meyer*, 113 F.2d at 392. It has stated that when "questions of bad faith, arbitrariness, and capriciousness [have been raised], the district court [is] required to resolve those questions." *See U.S. v. 58.16 Acres of Land*, 478 F.2d 1055, 1059 (7th Cir. 1973).

The Ecks argue that the Corps of Engineers violated the requirement of its own regulations that it perform an Environmental Assessment (EA) by choosing Site 15 (the accused 5.0 Acres) for the placement of dredged materials; while the Corps of Engineers performed an environmental assessment ("EA"), the Ecks argue that it was the equivalent of no EA because it mischaracterized the site as an agricultural field, when in fact it was an economically and environmentally far more valuable recreational hunting site. Pl.'s Trial Ex. 2 at 9. Indeed, the Ecks point out that even Clevenstine, who approved the project on behalf of the U.S. Fish and Wildlife Service, was unaware that the property was being used for hunting and waterfowl management.[4]

The Ecks cite *Sierra Club v. Martin*, 168 F.3d 1 (11th Cir. 1999), arguing that it sets forth the proper meaning of "arbitrary and capricious" in instances where the

[4] The Government blames the Ecks for the Corps of Engineers' ignorance, arguing that the Ecks denied the Corps of Engineers permission to inspect the property adequately. In fact, the record does not support the Government's contention. While the Government states repeatedly that various personnel had no permission to enter upon the premises, it never states that it requested permission and was turned down. Furthermore, in the fall of 1999, the Ecks signed a right of entry onto their property, giving the Government access. Without any indication that permission was requested and refused, the court cannot find the Ecks responsible for any inadequacy in the Corps of Engineers' information.

Government acts on the basis of inaccurate information.  *Sierra Club* was not a condemnation action but an action arising under the Administrative Procedure Act. *Sierra Club*, 168 F.3d at 3.  It involved the Forest Service's decision to sell timber rights to seven tracts within the Chattahoochie National Forest, enabling logging (including clearcutting), road building (18 miles of roads would be required), the discharge of 155.1 tons of sediment and related activities.  *Id.* at 2.  The Sierra Club argued that in conducting a required site-specific study to determine projected environmental harms, the Forest Service failed to obtain and hence consider a population inventory and trend data for proposed, endangered, threatened, or sensitive species (PETS species).  *Id.* at 3.  In failing to obtain this data, the Sierra Club argued, the Forest Service violated its Forest Plan and the provisions of the National Forest Management Act (NFMA).  *Id.*

The district court granted summary judgment for the defendant, holding that the Forest Service was not required to obtain population data for PETS species.  *Id.*  The Court of Appeals reversed, holding that Agency actions must be reversed as arbitrary and capricious when the Agency fails to examine the relevant data and articulate a satisfactory explanation for its action.  *Id.* at 7.  The Forest Plan explicitly required that the Forest Service gather and consider PETS species data.  *Id.*  The Forest Service's failure to gather this data violated the Forest Plan, and the decision to approve the timber sales without considering this data was arbitrary and capricious.  *Id.*  The Ecks maintain that the Corps of Engineers' mischaracterization of their land as an agricultural field rather than as a recreational wildlife/hunting reserve made its EA meaningless, and that the Corps of Engineers' reliance on erroneous information was analogous to the Forest Service's failure to gather PETS species data in *Sierra Club*.

It is first of all unclear that the standards of the Administrative Procedure Act apply in a condemnation action. At least one district court has held that the Administrative Procedure Act does not apply to judicial review in condemnation actions, but that the standard for determining bad faith is properly borrowed from that Act. *See United States v. 45,149.58 Acres of Land*, 455 F. Supp. 192, 200 (D.C.N.C. 1978). Even if this court were to adopt the APA's definition of arbitrary and capricious, however, and even if it were to find that Agency action resting on a mistake of fact (viewing Site 15 as agricultural land, rather than as land utilized for hunting and wildlife management) was equivalent to a failure to gather required information, the court would not find a basis for preventing this condemnation.

The chronology of events makes clear that the Corps of Engineers' Dredged Material Management Plan, which selected Site 15 (the 5.0 Acres of the Ecks' property), was completed and published in February 2000, when the Ecks' development of their property for wildlife management was just getting underway. Indeed, when the Corps of Engineers began its site selection process in 1996, by studying maps, databases and aerial photographs, the Ecks' property *was* an agricultural field, as it was in 1998, when a Corps of Engineers team did a site inspection, and in October 1999, when Clevenstine, based on a map survey but without visiting the property, signed off on the Environmental Assessment portion of the Plan. It was not until well after 2000, after the DMMP was finalized, when significant development is visible in an aerial photograph. Moreover, Ronald Williams ("Williams"), a real estate appraiser employed by the Corps of Engineers, testified at trial that when he visited the Ecks' property in June, 2001, the Ecks were in the early stages of putting in the ponds and other improvements. Tr. at 158-59.

Thus, when the DMMP was finalized and published, it reflected accurate information on the state of the Ecks' land. On these facts, even were the court inclined to set aside agency action based on a serious misapprehension of the state of the Ecks' property, there was no serious misapprehension.[5]

The Ecks next argue that the Corps of Engineers failed to describe or evaluate alternative sites. According to the Ecks, the DMMP analyzed only 6 preferred locations and eliminated an additional 10 sites. The Eks criticized the Corps of Engineers for eliminating Site 7, even though the Corps of Engineers' activities were within the regulated distance from Commonwealth Edison's ("ComEd's") power lines at the site; the Corps of Engineers eliminated Site 7 because in past operations at similar sites, the Corps of Engineers had accidentally hit ComEd power lines with the dredge's crane. Other sites were eliminated due to cost-prohibitive floodplain mitigation issues or, in the case of Site 8, due to the need for costly studies of potential contaminants on the property.

A total of 15 sites were considered by the Corps of Engineers in the DMMP. Section F details the reasons for eliminating 9 of those sites. The remaining 6 sites considered by the Corps of Engineers were subjected to environmental analysis as detailed in the EA appended to the DMMP. Moreover, at trial, the court heard extensive testimony from Michael Cox, the Corps of Engineers' dredging coordinator and past

---

[5] Although the record indicates that from the time Eck, Sr. purchased the property in 1992, the Eck family used the property for hunting and intended to develop it for wildlife management, there is no evidence that any of this information was shared with the Corps of Engineers at or near that time. When George Sporer of the Corps of Engineers contacted Eck, Sr. in late 1997 to inform him of the Corps of Engineers' interest in his property, Eck, Sr. told him, in Sporer's words, to leave him alone and that there were other more suitable sites available. Sporer Dep. Tr. 27-28. Unlike the Government, the court finds no reason here to shift the blame for any misunderstanding to the Ecks; rather, the court finds that there was no misunderstanding and the Corps of Engineers acted on the basis of accurate information as to the condition of the property. The Corps of Engineers did not have knowledge of the Ecks' intentions, but it is not clear that such information would have been relevant in any case.

president of the Western Dredging Association. Cox described in detail the reasons why Site 15 was selected as the preferred site, describing, *inter alia*, safety issues with power lines and floodplain issues at other sites. Tr. 373-97. Cox emphasized the fact that the 5.0 Acres, which are in the downriver hydraulic shadow of the railroad berm, were ideal because such a location mitigated the potential for flooding that could return the deposited silt back into the river. Tr. 391-92.

Given the descriptions listed in the DMMP and the EA, as well as Cox's testimony at trial, the court finds that the Corps of Engineers did not fail to describe or evaluate alternative sites.

The Ecks' third argument, that the Corps of Engineers violated its own regulations by failing to update the DMMP, also fails. The material cited by the Ecks in support of this argument indicates that the DMMP itself requires that it be kept current, not that regulations mandate updating. Pl.'s Trial Ex. 2 at 19. More importantly, the Ecks' argument means that even when the Corps of Engineers has decided upon a particular site, based on accurate information, the owner can thereafter add improvements and changes to the property's use and force the Corps of Engineers to start the site selection process again. No matter what "arbitrary and capricious" means, it cannot mean this, for such a limitation on the eminent domain power would leave the Government powerless to condemn land in the hands of an unwilling owner. In this case, once Williams was allowed on the property and was able to perform a thorough assessment, the Government raised the amount of compensation it offered for the 5.0 Acres from $16,000 to $80,000, based upon its recognition that the highest and best use of the land was for recreation and hunting. Given the evidence that the Corps of

Engineers' activities are unlikely to interfere with the Ecks' hunting on a frequent basis, the court cannot find that its decision to adhere to Site 15, despite the Ecks' improvements, was arbitrary, capricious or otherwise in bad faith.

In summary, the Ecks have failed to demonstrate that the Corps of Engineers acted in an arbitrary and capricious manner by failing to obey the regulations and procedures that are prerequisite to a taking of the 5.0 Acres. Consequently the court finds that the taking of the 5.0 Acres by the Government is validly within its powers of eminent domain.

B. Valuation of Property

According to the Supreme Court, whenever the Government has physically acquired through its eminent domain powers a portion of a distinct tract of property, "the compensation to be awarded includes not only the market value of that part of the tract appropriated, but the damage to the remainder resulting from that taking, embracing, of course, injury due to the use to which the part appropriated is to be devoted." *United States v. Grizzard*, 219 U.S. 180, 183 (1911). Damages to the remainder of the property not appropriated are generally known as "severance damages." *See generally United States v. 50.50 Acres of Land*, 931 F.2d 1349, 1359 (9th Cir. 1991). Severance damages are appropriate only when the land not taken is contiguous to the taken parcel and only if there is unity of ownership. *United States v. 87.30 Acres of Land, etc. State of Wash.*, 430 F.2d 1130, 1133 (9th Cir. 1970). It is undisputed that both of these requirements are satisfied in the instant case.

Although there is apparently no case law on point within the Seventh Circuit concerning the method of valuation of the portion of the property remaining after the

appropriation, there is consistency in other circuits as to the methodology employed. In general, the proper measure of severance damages is the difference between the value of the entire parent tract before the taking and its value after the taking. *United States v. Virginia Elec. Co.*, 365 U.S. 624, 632 (1961); *United States v. 8.41 Acres of Land, Situated in Orange County, State of Texas*, 680 F.2d 388 (5th Cir. 1982). Put another way, this "before and after" method employs a three-step analysis: (1) the court determines the value of the property before the taking; (2) it determines the value of the property lying within the taken tract after the taking; and (3) it determines the incidental damages, arising from the taking, to any land adjacent to the taken tract. *U.S. v. 104 Acres, more or less, in Keeler Twp., Van Buren County, Mich.*, 666 F. Supp.1017, 1020 (W.D. Mich. 1987).

An alternative method computes damages as being equal to the value of the actual land taken plus the diminution in the value of the remaining land in the parent tract. Both methods take into consideration the loss of the part taken and "severance damages" to the remainder of the property left after the taking. The Fourth Circuit allows use of the second method. *United States v. 97.19 Acres of Land, More or Less*, 582 F.2d 878, 881 (4th Cir. 1978); *See also* 4A Nichols, THE LAW OF EMINENT DOMAIN § 14.31 (rev. 3d ed. 1981). However, the first method (sometimes called the "before and after" method) seems to be favored by most federal jurisdictions. *See, e.g., Illig v. U.S.*, 58 Fed. Cl. 619 (Fed. Cl. 2003); *U.S. v. 14.38 Acres of Land, More or Less Situated in Leflore County, State of Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996); *In re Flatt*, 160 B.R. 497, 501 (Bankr. N.D.N.Y. 1993); *United States v. 91.90 Acres of Land*, 586 F.2d 79, 86 (8th Cir. 1978),

*cert. denied*, 441 U.S. 944 (1979) *U.S. ex rel. Tenn. Valley Authority v. Indian Creek Marble Co.*, 40 F. Supp. 811 (E.D. Tenn. 1941).

Employing the "before and after" method in the instant case, therefore, the court must determine the value of: (1) the entire plot owned by the Ecks prior to the taking; (2) the value of the 5.0 acres at issue after the taking; and (3) the incidental (or severance) damage to the remainder of the Eck's property as a result of the taking.

The Ecks initially purchased the 195-acre property in 1992 for the sum of $254,000 or approximately $1300 per acre. Since that time the Eck family has used it for hunting and recreational purposes; a 60-acre portion is also farmed by an unrelated individual in cooperation with the Ecks. The Ecks have developed land comprising approximately 23 acres set back approximately 860 feet from the riverbank and directly west of the 5.0 Acres into a seasonal wetlands habitat for waterfowl.

Both parties have had the value of the land prior to, and after, the taking of the 5.0 Acres assessed. According to the Government's assessment, performed by Douglas C. Nelson ("Nelson") with the cooperation of the Ecks, the highest and best use of the land is hunting and wildlife management. Using comparisons with five other comparable local land sales, Nelson calculated a market value prior to the taking of 195.2 acres at $6500 per acre, for a total of $1,270,000. Nelson found that, considering the effect on the parent parcel of the taking of the 5.0 Acres for dredging activities and the strong market for hunting/recreation land, the post-taking value of the remaining 190.2 acres was $6250 per acre, or $1,190,000. Nelson did not explain how he arrived at these specific figures. The difference of $80,000 (the Government's proposed compensation) was allocated by Nelson as being $32,500 for the 5.0 Acres at their pre-taking value ($6500 per acre

multiplied by 5 acres) plus severance damages of $47,500. The latter reflects the Government's view of the slightly diminished post-taking value of the remaining land (a decrease of $250 per acre multiplied by 190.2 acres.

Nelson stated that the result of the taking would be to reduce only slightly the recreation and hunting potential of the property. He based this conclusion upon a report prepared by Clevenstine. According to Clevenstine, several factors contributed to the minimal effects of the proposed sediment placement activities on the 5.0 Acres upon the hunting activities at the Eck's wetland facility. Clevenstine claimed that the distance between the center of the placement site and the eastern edge of the wetlands site is approximately 1400 feet (one quarter mile)[6] and, that at such a distance, the activity would be no greater than other sources of potential disturbance, including a barge terminal on the property adjacent to the western edge of the wetlands site.

Clevenstine disputed assertions contained in a report prepared for the Ecks by Potter of the Max McGraw Wildlife Foundation that the dredged material to be deposited on the 5.0 Acres would pose a significant threat of harmful environmental contamination. According to Clevenstine, the material dredged from the navigation channel consists typically of sand with very little fine material; the latter is usually associated with harmful contaminants. Therefore, according to Clevenstine, the silt comprising most of the dredged material has little potential to absorb, transport, and release contaminants into the wetlands site.

In summary, Nelson, using Clevenstine's report as evidence, concluded that the dredging, transport, and deposition activities on the 5.0 Acres will have little negative

---

[6] The court's measurement of the distance from satellite photographs placed the western edge of the 5.0 Acres approximately 1000 feet from the eastern edge of the wetlands site.

effect on hunting and conservation activities, and should result in only a slight decrease (approximately 4%) of the value of the land, post-taking. Thus, the total compensation for the taking proposed by Nelson is $80,000.

Unsurprisingly, the Ecks' accountant, Gary DeClark ("DeClark"), sees things somewhat differently. DeClark agrees that the best and highest use of the land is hunting and wildlife management. However, DeClark's calculated valuation of the land prior to the taking is $9,000 per acre, or $1,755,000. According to DeClark, the value of the unimproved land, based on the sale of comparable properties, is $4,134 per acre, or $806, 956 for the total 195.2 acres. However, to this must be added the value (including depreciation) of the Ecks' improvements to the land, especially those connected with the construction of the wetlands site. These are estimated by DeClark as being valued at $950,000, adding a value of $4866 per acre, for a total value per acre of $9000. DeClark's valuation of the improvements is based on a detailed estimate of the improvements and infrastructure on the property as of June, 2004 that was prepared by Michael J. Cap ("Cap").

In his analysis of the value of the property after the taking of the 5.0 Acres, based on Potter's report, DeClark agreed with Potter that the taking of the 5.0 Acres essentially constituted "a taking of the waterfowl management capabilities of [the] property …." Although DeClark and Potter acknowledge that the improvements would be physically untouched by the condemnation of the 5.0 Acres, they contend that its value as a hunting preserve would be entirely lost. Therefore, the value of the improvements, less 10% salvage and residual use, is subtracted from the residual 190.2 acres post-taking, resulting in a decreased value of $5100 per acre (from an original estimated value of $9000 per

acre) for a total post-taking value of $970,000 for the remaining property. Thus, according to DeClark, just compensation for the land should be $785,000 ($1,755,000 less $970,000), almost ten times greater than that proposed by the Government.

The parties obviously differ in their analysis of whether the property will continue to be useful for hunting and wildlife management after the taking. But beyond this, a principal source of the disparity in the parties' notions of what constitutes just compensation lies in their respective valuations of the improvements, specifically the installation and infrastructure of the wetlands site. The Government, relying on an appraisal of the improvements made by Jon Lutz ("Lutz") following an inspection of the wetlands site, claims that the value of the improvements is $358,424, whereas the Ecks' expert, Cap, claims that the value is $950,000. An item-by-item comparison of the respective analyses is instructive.

The Government estimates that the components of the installed storm sewer cost $42,490; Cap's estimate for the same item is $31,500. The Government's estimate for the components of the water pumping and distribution system to the wetland ponds is $65,900; however, Cap's estimate for the same is $109,580. Cap's estimate is inarguably more thorough. Unlike the Government, Cap includes a detailed list of the cost of pipe of various diameters (a total of 2280 linear feet of pipes of varying diameter) whereas the Government includes only 1500 linear feet of 8" water main. Cap includes the cost of the housing used to shelter the pumps ($1000) and his estimate of the replacement costs of the 15-horsepower pumps (3 at $8,000 each) exceeds that of the Government (3 at $5,000).

Cap estimates the cost of running utilities (specifically the electrical service connections; transformers, secondaries, and the like) at $80,000. The Government provides no estimate for this cost, citing insufficient information, although it was uncontroverted at trial that the Ecks had run power lines out to the wetland sites to provide power for the pumps as well as distributed electrical power to various sites, principally the duck blinds.

Excavation costs were estimated by Cap to be $397,263, whereas the Government estimated them to be $119,150. Cap contends that 25 acres (the approximate size of the wetlands site) were cleared and grubbed at a total cost of $20,000 (at as cost of $800 per acre); the Government contends that only four acres were cleared and grubbed at a cost of $3,000 (at a cost of $750 per acre). Excavation costs were estimated by Cap to be $136,585 (basin excavation of 19,667 cubic yards and embankment excavation of 450 cubic yards at $5 a cubic yard, plus excavation of ditches and swales (2400 linear feet at $15 per linear foot)); the Government estimates the total excavation costs at $100,750 (18,400 cubic yards of basin and berm excavation at $5 a cubic yard and 1,750 linear feet of "minor ditch" at $5 per linear foot). Cap adds $98,862 for stripping the topsoil from the basins and $142,416 for adding four inches of topsoil to other areas of the wetlands and adjacent farmed sites, and hydraulic seeding (types 1 and 4). The Government does not include allowances for the stripping and redeposition of the topsoil, nor does it include expenses for internal grading of the basins; it does, however, include costs of $15,400 for "seeding fertilizer, and mulch."

Both parties acknowledge the installation of pedestrian bridges and permanent concrete duck blinds: Cap estimates the cost for these at $74,550 and the Government estimates the cost for the same structures at $66,300.

However, the parties differ significantly in their assessment of the engineering, surveying, and design costs. The Government estimates these costs as totaling $32,000 ($15,000 for design; $14,000 for surveying; and $3,000 for construction coordination). The corresponding estimate of costs by Cap is much greater: Cap estimates the total as being $62,360 ($34,644 for engineering design and $27,716 for surveying).

Finally, Cap includes an entry for "Contractor's fees and expenses" that he estimates at 30% of the adjusted total of the site improvements, or $207,868. The Government makes no explicit allowance for contractor's fees in its estimate, claiming that contractor's profits were included in the analyzed costs.

In summary, the Government estimates the replacement costs of the wetlands site (after a 10% cost multiplier applied by the Government) at $358,474; Cap estimates the replacement costs for the same site (after his upward costs adjustment of 5%) at $997,765, which he subsequently rounds down to $950,000.

The court finds Cap's analysis of the costs more persuasive, if only because of the greater overall attention paid to detail in the estimate, and the relatively close correlation of the costs of items upon which both parties agree. The Government's analysis admittedly omits important elements (e.g., the electrical connections and power supplied to the site) and tacitly omits others (e.g., significant lengths of piping in the plumbing connections). However, there are discrepancies in Cap's report as well: Cap includes $98,262 for topsoil stripping of the basins, and Eck, Jr. testified at trial that the topsoil

was stripped; however, Lutz, in his report, states that he did not include the cost of topsoil stripping because Eck, Jr. told him that scrapers and bulldozers (used in topsoil stripping) were not utilized in topsoil stripping.

Given the order-of-magnitude disparity between the Government's and Cap's estimates, the court cannot simply split the difference between the two estimates. Moreover, the court is not convinced that the periodic dredging operations and concomitant deposition of sediment on the 5.0 Acres will comprise an entire taking of the wetlands site, rendering the improvements essentially valueless for hunting and conservation purposes, save the salvage costs. Uncontested evidence at trial indicated that dredging at the Dresden Island site has occurred ten times in the past 15 years, but six of those operations have occurred between February and August (when the site is drained and waterfowl are typically not present) and eight occurred outside of the Illinois Central Zone hunting season. The result is that dredging, with its potentially disruptive effects, appears to have occurred within or close to the hunting season at this site twice in the past 15 years. Eck, Jr. testified at trial that the ducks were not disrupted when the dredging took place outside of the season. Tr. 104-05. No evidence was adduced to suggest that the hunting would be disrupted, or that significant numbers of birds would abandon the site, if dredging and deposition took place outside of the hunting season.

The Ecks' property is not a nesting site for the waterfowl; rather it is located on a migratory flyway. This means that the waterfowl population at the Ecks' site is a transient one, with waterfowl departing and new birds arriving daily during the course of the migratory period. Uncontroverted testimony at trial established that the waterfowl do not use the Ecks' property as a nesting site and are not residential; rather, the birds are

gone by the end of January when the season ends and the ponds are drained. Tr. 226. Thus, it is likely that once any dredging operations cease, new birds will arrive shortly thereafter.

That is not to say that there are no residual severance damages to the wetlands site whatever. Looking at the history of Corps of Engineers dredging operations at the Dresden Island site, one can approximate the likelihood that dredging operations will coincide with the waterfowl hunting season on the Ecks' property, albeit based on evidence of what has occurred in the past. Specifically, in the past ten years, dredging operations have taken place in the vicinity of the 5.0 Acres at the Marseilles Pool (miles 270.7 - 272) and the Dresden Pool (miles 271.5 - 272) at the following intervals:

| Year | Dates of dredging operations | Duration (days) |
|------|------------------------------|-----------------|
| 1998 | January 26 - March 16 | 49 |
| 1998 | April 16 - May 24 | 38 |
| 2000 | March 1- May 4 | 65 |
| 2000 | June 19 - June 20 | 2 |
| 2002 | March 12 - March 26 | 14 |
| 2003 | February 4 - February 27 | 23 |
| 2005 | September 6 – October 22 | 46 |
| 2007 | September 8 – September 21 | 13 |

According to the Corps of Engineer, therefore, only twice in the past ten years have dredging operations impinged upon the late October – late January waterfowl hunting season. Given the above figures, and the testimony at trial, one can predict that approximately four to five times in the next twenty-two years (the duration of the DMMP), waterfowl hunting and conservation activities will be disrupted for four days out of the week for a portion of the hunting season, with some possible residual effects.[7]

---

[7] Since the Corps of Engineers works 10 hour days, four days a week, when dredging and deposition operations are underway, waterfowl hunting on those days is likely to be disrupted. Waterfowl hunting on

All this assumes, of course, that dredging will take place during the heart of the hunting season which, historically, has only rarely happened. Historical evidence may not be a sure guide to the future, however. And even outside the duck and goose hunting seasons, the Ecks' ability to use and enjoy the remainder of their property for recreation and other types of hunting will be somewhat impaired by the dredging-related activities on Site 15, as well as by the creation of a large dumpsite. Severance damages must compensate the Ecks for these harms as well.

The court therefore calculates the severance damages to the remainder of the Eck's property as follows. Based upon the history of dredging operations over the past ten years, the court predicts (rounding up) that dredging operations will occur five times during the waterfowl hunting season over the next twenty two years. Assuming that the dredging operations will last for 45 days during each of the disruptions, the waterfowl hunting will be disrupted or prevented on 4/7ths of those days (the Corps of Engineers conducts dredging operations four days per week for ten hours per day) for an average of 26 days per dredging operation during which wildfowl will be disturbed by the deposition of silt onto the 5.0 Acres. This means that over the next twenty two years, the Ecks will lose 129 days of waterfowl hunting due to the disruption caused by dredge deposition.

Assuming that the duration of the waterfowl hunting season remains constant at approximately 85 days over the next twenty two years (for a total of 1870 possible hunting days), this means that the Ecks will predictably lose approximately 7% of their total potential hunting days over the next twenty two years. The court increases that loss

---

the remaining three days of the week may also be somewhat disrupted, but likely less so because the wetlands site is located on a migratory flyway, so that new, transient populations of migrating waterfowl are continually entering and leaving the wetlands site during the migratory season. Dredging operations may last from two to sixty-one days; the mean duration of the operation is approximately 31 days.

percentage to 15% against the possibility that the number of days will be increased due to factors beyond the court's ability to predict or that disruption may be greater than assumed.[8]

Therefore, the court finds that the value of the improvements to the Ecks' property, valued by Cap at $950,000 is diminished by 15%, or $142,500. Furthermore, the court finds that the 25 acres of land upon which the Ecks' improvements are located, and which are dedicated to seasonal use as wetlands for the purposes of hunting and conservation, are also diminished in value by 15%. Employing the Government's pre-taking valuation of $6500 per acre; the court arrives at a figure of $24,375, which constitutes the loss of value to the property upon which the Ecks' improvements are located. Therefore, the court arrives at a total of $166,875 in severance damages to the parent parcel of the Ecks' property. To this sum is added the cost of the 5.0 Acres themselves, calculated at $32,500, based upon the Government's valuation of the pre-taking price of $6500 per acre. The total amount awarded the Ecks as compensation for the 5.0 Acres and as severance damages is therefore $199,375.

It is, moreover, clear that the condemnation of the 5.0 Acres to the United States does not absolve the Corps of Engineers of responsibility for profligate interference with wildlife or the Ecks' use of their remaining land. *See, e.g., Northwest LA Fish & Game Preserve Com'n v. U.S.*, 446 F.3d 1285 (Fed. Cir. 2006); *U.S. v. 27.09 Acres of Land*, 737 F. Supp. 277, 285 (S.D.N.Y. 1990) (condemnation action does not preclude further litigation for failure to comply with environmental laws).

---

[8] The court notes that the past several dredging operations have taken place in autumn, close to or during the hunting season.

### III. Conclusion

For the reasons set forth above, the court finds that the Government's taking of the 5.0 Acres is neither arbitrary nor capricious and is therefore within the Government's legitimate power of eminent domain under the Constitution.  The Government is ordered to pay the Ecks $199,375 in compensation and severance damages.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: September 30, 2008